Magistrate Judge Michelle L. Peterson

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

FEB 16 2023

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>RIGOBERTO CAMPOS-SAUCEDO,<br><br>Defendant. | CASE NO. MJ23-069<br><br>COMPLAINT for VIOLATION<br><br>Title 21, U.S.C. Sections 841(a)(1) and 841(b)(1)(A) |

BEFORE the Honorable Michelle L. Peterson, United States Magistrate Judge, U.S. Courthouse, Seattle, Washington.

The undersigned complainant, Detective, Renton Police Department, Christian Mercado, being duly sworn states:

## COUNT ONE

**(Possession of Controlled Substances with Intent to Distribute)**

On or about February 14, 2023, at King County, within the Western District of Washington, Rigoberto CAMPOS-SAUCEDO did knowingly and intentionally possess with the intent to distribute, and aid and abet the possession of with intent to distribute, a

Complaint - 1
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

controlled substance, including: cocaine, fentanyl, methamphetamine, and heroin, which are substances controlled under Title 21, United States Code, Section 812.

It is further alleged that the offense involved 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide (fentanyl), and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

And the complainant states that this Complaint is based on the following information:

I, Christian Mercado, being first duly sworn on oath, depose and say:

## INTRODUCTION

1. I am a Detective with the Renton Police Department and have been employed by the City of Renton since November 16, 2010. I have been a commissioned police officer since March 2007. During my law enforcement career, I have been assigned to the Patrol Division, Bicycle Patrol, and plain clothes investigations in the Special Enforcement Team (SET). I am currently assigned as a SET narcotics detective. SET focuses on investigating crimes of all types, including drug related cases such as possession of narcotics, possession of drug paraphernalia, possession of narcotics with intent to deliver, and the unlawful manufacture of controlled substances.

2. I have completed 664 hours of basic law enforcement training at the San Bernardino County (CA) Sheriff's Academy and an Equivalency Academy at the Washington State Criminal Justice Training Center (W.S.C.J.T.C.). I have received training and instruction in use of force/defensive tactics, firearms, evidence handling/processing, narcotics investigations, emergency vehicle operation, organized

Complaint - 2
*United States v. Campos-Saucedo*
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

crime/gang investigations, property crime investigations, violent crime investigations, domestic violence investigations, forgery and computer crimes investigations, DUI investigations/processing, and a variety of related topics.

3. I have investigated and assisted with numerous cases involving the use, possession, distribution, and manufacture of narcotics, including methamphetamine, oxycontin, heroin, rock and powder cocaine, marijuana, MDMA, LSD, PCP, and various prescription drugs. I am familiar with various methods of ingestion of narcotics and paraphernalia associated with the use, packaging, and distribution of these drugs. I have observed and interacted with numerous individuals who have been arrested for drug-related crimes.

4. I am also familiar with the physical characteristics, including colors, odors, textures, consistencies, markings, and sizes of a variety of narcotics, including methamphetamine, MDMA, cocaine, LSD, PCP, heroin, oxycontin/oxycodone, fentanyl, and marijuana. I am familiar with the various tools and implements used to inject, smoke, snort, inhale, and otherwise ingest narcotics into the human body such as, but not limited to, glass pipes of various shapes/sizes, modified aluminum cans, modified plastic bottles, plastic and metal tubes such as straws, modified writing pens, tinfoil, aluminum and/or other heat conducive materials, wire mesh screens, lighters/torches, hypodermic needles, rubber tubing, cotton balls, rubbing alcohol, metal spoons/bowls, and a variety of similar items.

5. I obtained the following information through personal observations, through information provided to me by other law enforcement officers and via police reports, and through discussions with other agents and officers who are familiar with the investigation of Rigoberto CAMPOS-SAUCEDO. I have also participated in conducting background investigations, including criminal histories, pertaining to the investigation for the offense described above. As a result, I am familiar with all aspects of this investigation. Because I am submitting this affidavit for the limited purpose of

Complaint - 3
*United States v. Campos-Saucedo*
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

establishing probable cause, however, I have not included each fact known to me concerning this investigation.

## SUMMARY OF PROBABLE CAUSE

6. This matter was investigated in part through a confidential informant ("the CI"), whose identity is known to the Renton Police Department and is a matter of permanent record. The CI is cooperating with law enforcement in exchange for monetary compensation. The CI can identify methamphetamine, cocaine, fentanyl, and various other narcotics and has demonstrated knowledge of the drug culture and trafficking trade, which is consistent with my own knowledge. I know that in part because the CI cooperated with law enforcement on two previous cases for consideration for his/her own pending narcotics delivery charge from March 2022. The CI's cooperation led to multiple successful controlled buys and subsequent search warrants. The CI completed his/her initial contract and is now cooperating for monetary compensation.

7. The CI knows that if he/she provides false information, the CI will have his/her contract voided and he/she will not be eligible to receive payment for services. The CI also knows that if false information is provided the CI could face criminal charges. He/she has no prior convictions for crimes of dishonesty.[1] His/her information and actions in this matter, described below, have proved reliable and credible. The CI has signed a consent to record form, giving authorization for members of the Renton Police Department to make recordings during investigations.

8. On February 1, 2023, the CI advised law enforcement that he/she could purchase various narcotics, including fentanyl pills, from a man he/she knows as either "Rigoberto" or "Rodrigo." At the time, the CI was not sure of the man's real or full name because they only refer to each other with nicknames and slang terms. As described

---

[1] The CI's criminal history lists prior immigration violations from 2015 and 2016, and no other offenses.

Complaint - 4
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

below, the CI ultimately identified a photograph of the defendant, Rigoberto CAMPOS-SAUCEDO, as the person he/she knows as "Rigoberto" or "Rodrigo." Accordingly, below I attribute the CI's references to "Rigoberto" or "Rodrigo" to CAMPOS-SAUCEDO.

9.  The CI has purchased narcotics from CAMPOS-SAUCEDO on multiple previous occasions. The CI stated that CAMPOS-SAUCEDO has previously driven a red Jeep Cherokee to the deals, that CAMPOS-SAUCEDO sometimes sent a woman (possibly his girlfriend) to make the delivery, and that the woman had previously driven a white Mazda SUV to the deals. The CI had met CAMPOS-SAUCEDO and the woman in person and affirmed that he/she could recognize them. The CI provided me CAMPOS-SAUCEDO's full mobile phone number, ending in -2255. I was unable to identify CAMPOS-SAUCEDO with that information.

10. At my request, the CI texted CAMPOS-SAUCEDO on CAMPOS-SAUCEDO's mobile phone number ending in -2255 and ordered a predetermined amount of pressed fentanyl pills. CAMPOS-SAUCEDO agreed to sell the pressed fentanyl pills to the CI for an agreed upon price. They agreed to meet at a location in the City of Kent, King County. I saw the text messages and confirmed the deal.

11. I conducted an operations briefing detailing the planned controlled buy with the CI and CAMPOS-SAUCEDO at the agreed upon meet location in Kent, King County. The CI was strip-searched, per CI contract and department policy, and no evidence, money, or contraband was discovered. The CI's vehicle was searched, and no evidence, money, or contraband was discovered. I provided the CI with pre-recorded buy funds to purchase pressed fentanyl pills from CAMPOS-SAUCEDO.

12. Another detective and I followed the CI to the meet location. The CI arrived and parked in the parking lot, where the other detective had a clear and unobstructed view of him/her. The other detective saw a white Nissan Altima (WA license BXH3899) pull into the parking lot and park near the CI. It was too dark for the

Complaint - 5
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

detective to identify anyone in the Altima. The CI got into the front passenger seat of the Altima for about a minute, then got out of the Altima and walked back to his/her vehicle. The Altima drove away.

13. After the deal, the CI informed me that he/she had met with CAMPOS-SAUCEDO (who the CI still referred to as simply "Rigoberto") in the Altima. The CI informed me that he/she had given the pre-recorded buy funds to CAMPOS-SAUCEDO in exchange for pressed fentanyl pills. I instructed the CI to drive back to my office. The other detective and I followed the CI to my office, where I immediately retrieved the pressed fentanyl pills from the CI. The CI was strip-searched, per CI contract and department policy, and no evidence, money, or contraband was discovered. The CI's vehicle was searched, and no evidence, money, or contraband was discovered. The CI was kept under constant visual observation by surveillance units from the point the CI left my office until he/she was released from my office. The CI did not transact with anyone other than CAMPOS-SAUCEDO.

14. The pressed fentanyl pills that the CI purchased from CAMPOS-SAUCEDO were packaged in a clear plastic baggie. The baggie contained small round blue pills with "M" imprinted on one side and "30" imprinted on the other. Although drugs.com identifies those pills as oxycodone based upon their markings, from my training and experience I know that fentanyl pills are commonly pressed to mimic oxycodone pills. There were approximately 1,000 pills in the baggie, with a total estimated street value of approximately $10,000. I field tested one of the suspected pressed fentanyl pills in accordance with my training, and it tested positive for fentanyl.

15. After the deal, surveillance units followed the Altima to the driveway of 20209 143rd Pl SE, Kent, WA, where the Altima parked. (We later discovered evidence strongly suggesting that the house was CAMPOS-SAUCEDO's residence, so I refer to it herein as "the Residence.") A detective saw the driver of the Altima get out of the vehicle and walk toward the front door of the Residence. Another detective drove by shortly

Complaint - 6
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

thereafter and did not see anyone in front of the Residence. Based on the timing, I believe the driver of the Altima entered the Residence through the front door. Surveillance was ended.

16. A records check of the Altima's license plate through the Washington DOL showed it was registered to a person I will refer to as V.G.F. at an address on 118th Pl SE in Kent. A records check of V.G.F. through WA DOL showed his registered address is an address on 27th Pl S in Kent. I checked a publicly accessible Facebook profile belonging to someone sharing V.G.F.'s first name and the first half of V.G.F.'s hyphenated last name. On the Facebook profile, I saw a picture of a Cadillac Escalade bearing WA license BRH5834, and a records check of that license plate showed it was registered to V.G.F. at the Residence, i.e., 20209 143rd Pl SE in Kent. I showed V.G.F.'s WA DOL photograph to the CI, and the CI stated he was not CAMPOS-SAUCEDO.

17. The next day, on February 2, 2023, I drove by the Residence and saw a red Jeep Cherokee with no license plates (unknown temp tag in rear window) and a white Mazda CX-5 (WA license CCW0809) parked in the driveway. These vehicles matched the CI's description of CAMPOS-SAUCEDO's vehicle and the vehicle of the unknown woman who made previous deliveries. Washington State Department of Licensing records show that the Mazda was registered to a woman I refer to as B.L.H. I showed B.L.H.'s Washington DOL photograph to the CI with no other descriptors. The CI positively identified B.L.H. as the woman who had previously delivered narcotics on behalf of CAMPOS-SAUCEDO.

18. I checked various law enforcement databases and found previous law enforcement contacts involving B.L.H. I checked various addresses associated with her and her associates and located a law enforcement record for Rigoberto CAMPOS-SAUCEDO. Because that first name matched one of the names provided by the CI, I showed CAMPOS-SAUCEDO's Washington DOL photograph to the CI with no other

Complaint - 7
*United States v. Campos-Saucedo*
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

descriptors. The CI positively identified CAMPOS-SAUCEDO as the same "Rigoberto" who delivered him the pressed fentanyl pills during the controlled buy.

19. On February 9, 2023, I conducted an operations briefing detailing planned surveillance and a second controlled buy by the CI from CAMPOS-SAUCEDO at a location in Kent. I provided the officers with Washington DOL photographs for CAMPOS-SAUCEDO and B.L.H. for identification purposes, and surveillance units set up around the Residence. The Altima and the Mazda were parked in the driveway, but the Jeep was not.

20. The CI arrived at my office and advised that he/she could purchase pressed fentanyl pills from CAMPOS-SAUCEDO. The CI advised he/she normally places the order with CAMPOS-SAUCEDO once the CI is already in place, so to maintain the appearance of normal business, I instructed the CI to place the order once he/she was in a predetermined meet location in Kent. The CI was strip-searched, per CI contract and department policy, and no evidence, money, or contraband was discovered. The CI's vehicle was searched, and no evidence, money, or contraband was discovered. I provided the CI with pre-recorded buy funds to purchase pressed fentanyl pills from CAMPOS-SAUCEDO.

21. Another officer and I followed the CI to the meet location. The CI arrived and parked in the parking lot, where the other officer had a clear and unobstructed view of him/her. Once in position, I instructed the CI to place the order with CAMPOS-SAUCEDO for a predetermined amount of pressed fentanyl pills. The CI called CAMPOS-SAUCEDO on CAMPOS-SAUCEDO's mobile phone number ending in -2255 and ordered the pressed fentanyl pills. CAMPOS-SAUCEDO agreed to sell the pressed fentanyl pills to the CI for an agreed upon price. They agreed to meet at the location in Kent. I was not in the same vehicle as the CI, so I could not hear the conversation, but I later saw the call log on the CI's phone and confirmed that he/she contacted CAMPOS-SAUCEDO's cell phone when instructed to do so.

Complaint - 8
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

22. About 5 minutes later, an officer surveilling the Residence saw the red Jeep with no license plates pull into the driveway and park. The female driver got out and walked into the front door of the Residence, leaving the Jeep running with its lights on in the driveway. The officer could not see whether there were any occupants still in the Jeep. About a minute later, the same woman exited the front door of the residence and got back into the driver's seat of the Jeep. At that time, a surveilling officer positively identified the female driver as B.L.H. based on the DOL photo.

23. The Jeep then drove directly to the meet location, where it parked near the CI's vehicle. An officer had a clear and unobstructed view of the vehicles. A man got out of the front passenger seat of the Jeep and got into the front passenger seat of the CI's vehicle. About a minute later, the man got out of the CI's vehicle and returned to the front passenger seat of the Jeep. The officer with a clear view positively identified the man as CAMPOS-SAUCEDO. The Jeep then drove away.

24. After the deal, the CI informed me that the male he/she met with was CAMPOS-SAUCEDO. The CI informed me that he/she had given the pre-recorded buy funds to CAMPOS-SAUCEDO in exchange for pressed fentanyl pills. I instructed the CI to drive back to my office, and another officer and I followed him/her there. I immediately retrieved the pressed fentanyl pills from the CI, who was strip-searched, per CI contract and department policy, and no evidence, money, or contraband were discovered. The CI's vehicle was searched, and no evidence, money, or contraband was discovered. The CI was kept under constant visual observation by surveillance units from the point the CI left my office until he/she was released from my office. The CI did not transact with anyone other than CAMPOS-SAUCEDO.

25. The pressed fentanyl pills that the CI purchased from CAMPOS-SAUCEDO were packaged in a clear plastic baggie. The baggie contained small round blue pills with "M" imprinted on one side and "30" imprinted on the other. Although drugs.com identifies those pills as oxycodone, from my training and experience I know

Complaint - 9
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

fentanyl pills are commonly pressed to mimic oxycodone pills. There were approximately 1,006 pills in the baggie, with a total estimated street value of approximately $10,060. Another detective who is also trained and experienced in narcotics field testing performed a field test on one of the suspected pressed fentanyl pills in accordance with his training, and it tested positive for fentanyl.

26. After the deal, surveillance units continued to follow the Jeep, which drove to three different stores. Officers watched CAMPOS-SAUCEDO and B.L.H. enter each of those stores for a few minutes before leaving. Surveillance then followed the Jeep to the address on 118th Pl SE in Kent, i.e., the house discussed above as associated with V.G.F. The Jeep parked there, and shortly afterward an officer drove by and saw two subjects matching CAMPOS-SAUCEDO and B.L.H. inside the residence. Surveillance was ended.

27. Based on the investigation, I determined there is probable cause to arrest CAMPOS-SAUCEDO for two counts of distribution of controlled substances. Because it appeared B.L.H. retrieved something from the Residence immediately preceding the second controlled buy and then drove CAMPOS-SAUCEDO to the controlled buy, I determined there is also probable cause to arrest B.L.H. for one count of distribution of controlled substances.

28. Because CAMPOS-SAUCEDO was followed directly from the first controlled buy to the Residence, I believed he stored proceeds from his narcotics enterprise there. And because CAMPOS-SAUCEDO and B.L.H. stopped at the Residence immediately prior to driving to the meet location for the second controlled buy, I also believed they stored narcotics there. Accordingly, I wrote and obtained a search warrant on February 10, 2023, authorizing a search of the Residence within 10 days.

29. On February 14, 2023, law enforcement executed the search warrant. I requested assistance from Valley SWAT based on a September 2022 Yakima Police

Complaint - 10
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Department case in which CAMPOS-SAUCEDO allegedly pointed a firearm at someone (according to CAMPOS-SAUCEDO's criminal history, the case remains pending and has not resulted in a conviction). I also felt SWAT was appropriate because the CI reported seeing a video of CAMPOS-SAUCEDO holding what appeared to be an AK-style rifle.

30. SWAT surrounded the Residence in the early morning, while it was still dark, and initiated a call out of the occupants. The Jeep, Mazda, and Nissan were all in the driveway of the Residence. After receiving no response from the occupants, negotiators established phone contact with a man who they believed was CAMPOS-SAUCEDO. The man eventually hung up on the negotiators. CAMPOS-SAUCEDO then exited the sliding door at the rear of the Residence and went to the side of the building. Although I do not know the precise details of his arrest, I recall hearing a SWAT operator on the radio advising he deployed a less lethal projectile when CAMPOS-SAUCEDO appeared to not comply with commands. I understand that SWAT hit him with at least one 40 millimeter round from a launcher, which is designed to be a less lethal tool to gain compliance. CAMPOS-SAUCEDO then fled northbound in an attempt to evade arrest. SWAT operators caught CAMPOS-SAUCEDO and took him into custody.

31. Eventually, B.L.H. exited the residence with two young children. Relatives of B.L.H. later arrived and took custody of the children. B.L.H. was arrested. CAMPOS-SAUCEDO and B.L.H. were both booked into SCORE jail.

32. Once the Residence was secured, law enforcement began the search. We located the following items, including four firearms and significant quantities of narcotics, drug distribution materials, and cash, in the following locations.

- Master Bedroom
    - Broken Samsung cell phone
    - Black Motorola cell phone in black/gray case
    - Silver iPhone in clear case
    - White iPhone in speckled case

Complaint - 11
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Black TCL cell phone
- Black leather purse with $51 US currency
- $350 US currency in brown leather backpack
- Gold colored medallions on nightstand
- Black wallet with CAMPOS-SAUCEDO's Washington ID and $2 US currency
- Broken gold colored medallion
- Similac can containing $5,505 US currency
- 3 apparent narcotics ledgers, containing columns with names, slang terms for narcotics, and pay/owe ledgers
- $10,000 US currency in purple backpack
- 17x .40 caliber unspent cartridges
- Smith & Wesson SW40F handgun (serial #PAC1722) with empty magazine inserted
- Hi-Point JCP handgun (serial #X7142092) with 10x .45 caliber unspent cartridges in magazine inserted
- Rock Island Armory 1911 handgun (no serial number) with 10x .45 caliber unspent cartridges in magazine inserted, spare magazine with 10x .45 caliber unspent cartridges, and spare empty magazine
- Colt 1911 handgun (serial #2833726) with empty magazine inserted
- Miscellaneous jewelry
- Clothes for men and women, in sizes appearing to be appropriate for CAMPOS-SAUCEDO's and B.L.H.'s builds

- Second Bedroom
  - A notebook containing, among other things, an apparent narcotics ledger, containing columns with names, slang terms for narcotics, and pay/owe ledgers

Complaint - 12
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- 1,360 Mexican Pesos
- Mailings and paperwork in CAMPOS-SAUCEDO's and B.L.H.'s names
- Washington DOL documents and Mexican ID cards for B.L.H.
- Additional clothes for men and women, in sizes appearing to be appropriate for CAMPOS-SAUCEDO's and B.L.H.'s builds, as well as children's clothing

- Third Bedroom
  - Digital scale with bowl and apparent narcotics residue (untested)
  - Multiple bottles of Inositol powder (possible cutting agent)
  - 12x 9mm unspent cartridges
  - 10x .45 caliber unspent cartridges
  - Ivory colored custom hand grip for Colt 1911
  - 2 digital scales with apparent narcotics residue (untested)
  - Rifle magazine with 10x 7.62 caliber unspent cartridges
  - 596.2 grams of heroin (weighed without packaging and field tested positive, in accordance with our training)
  - 6,086.71 grams of methamphetamine (weighed without packaging and field tested positive, in accordance with our training)
  - 18,709.54 grams of cocaine (weighed without packaging and field tested positive, in accordance with our training)
  - 31,621 pressed fentanyl pills (weighed without packaging and field tested positive, in accordance with our training)[2]

---

[2] The entire set of fentanyl pills has not yet been weighed, but officers weighed one of the pills, which weighed 0.11 grams. That weight is consistent with my training and experience as to the usual weight of pressed fentanyl pills. Assuming that average weight, the fentanyl pills would weigh approximately 3,478 grams.

Complaint - 13
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- 85 grams fentanyl powder (weighed without packaging and field tested positive, in accordance with our training)
- Packaging materials including Ziploc baggies and cling wrap
- Kitchen / Dining Room
    - $289 US currency on Santa Muerte shrine
    - Mailings and paperwork in CAMPOS-SAUCEDO's and B.L.H.'s names

There was a fourth bedroom that contained children's toys and seemed to be a children's playroom.

33. A records check of the Smith & Wesson handgun (serial # PAC1722) through WACIC showed it was reported stolen through Yakima PD (case # 20Y035249). Dispatch confirmed the stolen record. The owner of the stolen gun confirmed with law enforcement that he/she does not know CAMPOS-SAUCEDO.

34. From my training and experience, I know that narcotics traffickers commonly pray to Santa Muerte for protection from law enforcement and from their enemies. Santa Muerte worshippers commonly place money on the shrines as tribute for spiritual protection of their narcotics enterprise. I also know from my training and experience that narcotics traffickers commonly use firearms to protect their product from potential robbery and to intimidate other traffickers to stay out of their area.

35. Based on the time and circumstances of the search warrant execution, described above, I believe that CAMPOS-SAUCEDO resided at the Residence and possessed the narcotics and guns therein. The search located numerous documents supporting that conclusion (all listed above), including a wallet with Washington ID for CAMPOS-SAUCEDO, court documents and other mailings in CAMPOS-SAUCEDO's name, and medical paperwork addressed to CAMPOS-SAUCEDO. The search also located utility bills addressed to B.L.H., Washington DOL documents for B.L.H., and Mexican ID cards belonging to B.L.H. (The mailings were addressed to CAMPOS-

Complaint - 14
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  SAUCEDO and/or B.L.H., but most of them were addressed to a different address—not
2  the Residence.) The documents were located throughout the kitchen, dining room, master
3  bedroom, and another bedroom in the residence. There were two other names on
4  documentation involving children, and I do not recall the names. In one of the bedrooms,
5  I located a document belonging to V.G.F., in a container filled with documents associated
6  with B.L.H. The closet in the master bedroom was full of clothes for men and women,
7  and the sizes appeared to be appropriate for CAMPOS-SAUCEDO's and B.L.H.'s builds.
8  There were clothes hanging in the closet of another bedroom, but it appeared to be
9  children's clothing and overflow clothing from the master bedroom. There were no
10 indications that any other adults stayed at the residence.

11     36.    There was no evidence of paystubs or employment records in the residence.

12     37.    Based on my training and experience, the drugs located in the residence are
13 estimated to have a current street value of approximately $2 million (if purchased by the
14 gram).

15     38.    On February 15, 2023, I interviewed CAMPOS-SAUCEDO at SCORE jail.
16 CAMPOS-SAUCEDO's primary language is Spanish. I am fluent in Spanish and have
17 spoken the language for over 35 years. I grew up in a bilingual home and learned Spanish
18 concurrently with English. I am currently certified as a Spanish translator through
19 Language Line Solutions. I advised CAMPOS-SAUCEDO of his *Miranda* rights in
20 Spanish from a department-issued Officer's Code book. CAMPOS-SAUCEDO stated he
21 understood his rights and agreed to speak with me.

22     39.    CAMPOS-SAUCEDO initially stated that he doesn't know the address
23 where he lives, but stated that he does not live at the Residence. CAMPOS-SAUCEDO
24 claimed his sister, who he identified by name but I will refer to as A.C., lives there. I did
25 not recall seeing any documents belonging to A.C. at the Residence. I then asked where
26 A.C. was because she wasn't seen at the Residence. CAMPOS-SAUCEDO changed his
27 story and said A.C. doesn't live there, but she lives in another location in Kent.

Complaint - 15
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | CAMPOS-SAUCEDO identified B.L.H. as his wife, although he clarified they are not
2 | officially married. He and B.L.H. share two children in common.

3 |     40.    I asked CAMPOS-SAUCEDO who else lived at the Residence and he again
4 | changed his story and said he was only there to caretake and was only renting a bedroom.
5 | CAMPOS-SAUCEDO claimed he rented the room for two months from a friend, who he
6 | identified by name but I will refer to as M.G. Through my research into the Residence, I
7 | never came across the name of M.G. associated with that residence. King County Parcels
8 | shows that the owner of the Residence is "2018-2 IH BORROWER LP." CAMPOS-
9 | SAUCEDO added that sometimes other people show up at the Residence.

10 |     41.    I asked CAMPOS-SAUCEDO why he ran from the Residence and he
11 | stated he got scared when he got hit on his wrist, which I took to be a reference to the 40
12 | millimeter, less lethal round that was used by SWAT during the surround and call out at
13 | the Residence.

14 |     42.    I told CAMPOS-SAUCEDO we had been surveilling him for months and I
15 | asked again how long he had been living at the Residence. He stated they were there for
16 | 2-3 months and it was just him and his family. CAMPOS-SAUCEDO specified that the
17 | Jeep and the Mazda at the Residence belonged to B.L.H. and that the Altima belonged to
18 | V.G.F. I asked how they pay for the cars and CAMPOS-SAUCEDO claimed both he and
19 | B.L.H. worked for BIG Construction and their boss was his brother-in-law, V.G.F. He
20 | claimed B.L.H. worked as a translator and that she spoke good English. He also claimed
21 | he got paid roughly $3,000 per month in cash. I asked how much rent was and CAMPOS-
22 | SAUCEDO asked "de toda la casa?", which translates to "for the whole house?" I asked
23 | if they rented the whole house and he claimed they only rented the room for $1,000 and
24 | that M.G. pays for the rest. I asked CAMPOS-SAUCEDO about the drugs in the
25 | Residence and he denied being involved with them and claimed they belonged to M.G. I
26 | confronted CAMPOS-SAUCEDO with the fact that I had previously seen him deliver
27 | narcotics and I wanted him to be truthful. CAMPOS-SAUCEDO requested an attorney

Complaint - 16
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and I concluded the interview. CAMPOS-SAUCEDO was later booked into SeaTac Federal Detention Center.

43. I also interviewed B.L.H. at SCORE jail on February 15, 2023. B.L.H. stated she didn't speak English, so I conducted the interview in Spanish. I advised B.L.H. of her *Miranda* Rights in Spanish from a department issued Officer's Code book. B.L.H. stated she understood her rights and agreed to speak with me.

44. B.L.H. identified CAMPOS-SAUCEDO as her husband, but specified they are not officially married. B.L.H. stated she, CAMPOS-SAUCEDO, and their two children have lived at the Residence for 3-4 months and they pay roughly $2,800 in monthly rent. CAMPOS-SAUCEDO gives her the money for rent and she pays it electronically through a website. B.L.H. stated they rent the house from a company, but she couldn't remember the company name. She specified that no one else but her, CAMPOS-SAUCEDO, and their two children live at the Residence. She went on to describe each room and its intended use. The master bedroom is where all four family members sleep. The bedroom across from the master bedroom has a bed, but no one sleeps there. The next bedroom down the hall is the children's playroom. The next room down the hall is where CAMPOS-SAUCEDO stored his narcotics supply. B.L.H. stated they kept the narcotics room locked and the key to that door was on the keychain along with the keys to the Mazda.

45. B.L.H. stated she has been aware that CAMPOS-SAUCEDO has been selling narcotics for about 3 years. CAMPOS-SAUCEDO has not always dealt in such large quantities, but recently got into higher quantities. B.L.H. stated CAMPOS-SAUCEDO would occasionally send her to make narcotics deliveries. She estimated she has delivered narcotics for CAMPOS-SAUCEDO approximately 20 times. B.L.H. claimed she did not know the details of CAMPOS-SAUCEDO's narcotics business, but she helped him when he asked and kept the ledgers updated for him. I asked about prices and B.L.H. believed they would sell pills for $1 each and an ounce of cocaine for $700.

Complaint - 17
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

She stated methamphetamine, heroin, and pills were not selling much, but cocaine was popular. B.L.H. stated she does not use narcotics and does not believe that CAMPOS-SAUCEDO uses narcotics.

46. B.L.H. stated neither she nor CAMPOS-SAUCEDO have jobs and their sole source of income was narcotics sales. B.L.H. stated the Altima belonged to V.G.F., but the Jeep and Mazda belonged to her. She described V.G.F. as CAMPOS-SAUCEDO's sister's husband. She admitted that the money used to purchase the cars was proceeds from narcotics transactions. B.L.H. stated CAMPOS-SAUCEDO did not store any narcotics or proceeds at any other location and stated he stored his money in a purple bag, which is consistent with what we located during our search.

47. B.L.H. was later released from SCORE jail.

//
//
//

Complaint - 18
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

Based on the above facts, I respectfully submit that there is probable cause to believe that Rigoberto CAMPOS-SAUCEDO committed the offense described herein.

_____
CHRISTIAN MERCADO, Complainant
Detective, Renton Police Department

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant committed the offense set forth in the Complaint.

Dated this 16th day of February, 2023.

_____
MICHELLE L. PETERSON
United States Magistrate Judge

Complaint - 19
United States v. Campos-Saucedo
USAO# 2023R00213

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970